IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PATRICIA S. YEOMAN                                              PLAINTIFF

           v.                 Civil No. 05-5151

MICHAEL J. ASTRUE[1], Commissioner of
the Social Security Administration                             DEFENDANT

J U D G M E N T

Now on this 23rd day of March, 2007, the captioned matter comes on for judicial review of the decision of the Commissioner of the Social Security Administration, denying plaintiff Patricia S. Yeoman benefits under the Social Security Act.

1.   The Court's role upon review of the decision of a Social Security Administrative Law Judge ("ALJ") is to determine whether the decision is supported by substantial evidence on the record as a whole.  **Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002).** Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support a conclusion. *Id.* The Court must consider not only the evidence supporting the ALJ's decision, but also that which fairly detracts from it, and must affirm if the record - viewed as a whole - contains substantial evidence to support the decision. *Id.* The Court may not reverse simply because the record also contains substantial

---

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007, and pursuant to F.R.C.P. 25(d)(1), has been substituted for Jo Anne B. Barnhart in this suit.

evidence that would have supported a contrary decision. **Haley v. Massanari**, 258 F.3d 742 (8th Cir. 2001).

The burden rests on the claimant to prove that she has a mental or physical disability that has lasted - or can be expected to last - at least one year and that prevents her from engaging in any substantial gainful activity. **Pearsall v. Massanari**, 274 F.3d 1211 (8th Cir. 2001).

2.   Yeoman filed her application for benefits on March 28, 2003, alleging that she became disabled on February 21, 2003, due to asthma, depression, and seizures.

A hearing before an Administrative Law Judge ("ALJ") was held on January 26, 2005.  At that time Yeoman was 26 years old.  She had an 8th grade education, and no vocationally relevant past work experience.

The ALJ found that Yeoman had the following severe impairments: borderline intellectual functioning, mood disorders, and a seizure disorder.  He found that her asthma was not severe. He concluded that Yeoman's severe impairments, taken singly or as a group, did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

The ALJ determined that Yeoman had the ability to perform light work, but had moderate limitations in the ability to accept and follow instructions; the ability to maintain attention and concentration; the ability to complete a normal workday and

workweek without interruptions from psychological symptoms; the ability to perform at a consistent pace without unreasonable rest periods;  the ability to respond appropriately to criticism from supervisors; the ability to set realistic goals; and the ability to make independent plans.  He found that she could perform "work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote, with few variables and require little judgment, and supervision required is simple, direct, and concrete."

The ALJ discredited Dr. Vann Smith's residual functional capacity assessment, finding it "not supported by the overall evidence of record," noting that Dr. Smith gave Yeoman a Global Assessment of Functioning ("GAF") score of 65, found her oriented in all spheres, found her mood "essentially appropriate" and her judgment and insight "grossly intact," her recall memory unimpaired, and found that she made appropriate eye contact.

On the basis of answers to interrogatories submitted to a Vocational Examiner, the ALJ determined that jobs exist in sufficient numbers which Yeoman is capable of performing, including hotel maid, assembler of small products, and poultry worker.

On June 20, 2005, the ALJ rendered an unfavorable decision in Yeoman's case.

On July 29, 2005, the Appeals Council denied Yeoman's request for review, making the ALJ's decision the final decision of the Commissioner.  This appeal followed.

3.   The administrative record reflects the following facts relevant to decision in this matter:

*   On January 13, 2003, Yeoman saw Jim Roelke, a Physician's Assistant in the office of her family doctor, Dr. Lonnie Robinson.  Roelke noted that Yeoman "thinks she had a seizure today," and had possibly had a milder episode a few days earlier.  She reported headaches for 2-3 months, and gave a history of possible seizure with a pregnancy four years earlier.  He scheduled Yeoman for an EEG and followup with Dr. Robinson.

*   On January 14, 2003, Yeoman had an EEG, which was read as normal.

*   On January 16, 2003, Yeoman was taken to the hospital by ambulance, and seen in the emergency room for seizure activity.  A CT scan of the head that same day showed "[n]o obvious acute process," a few "nonspecific periventricular white matter changes," and "[m]ild atrophy, consistent with age."

*   On January 19, 2003, Yeoman was seen in the emergency room for seizure activity.  Dr. Phillip Bufford noted

-4-

that she was noncompliant with her anti-convulsant medication.

* On January 22, 2003, Yeoman saw Dr. Robinson.   He charted "new onset seizure disorder," but noted that Yeoman had had "similar problems during her pregnancy, described as generalized tonic, clonic seizures."   He noted that the seizures were accompanied by aura, diminished hearing and vision, and tingling paresthesias in her arms and legs.   He noted that Yeoman was supposed to be taking Dilantin, but was "somewhat noncompliant" and that her level of the medication was low.   He also noted "at least 6 seizures in the last 2-3 weeks."   CT scan of the head was normal.   Dr. Robinson added Klonopin to the Dilantin "to try to add some control until she can see Dr. Robbins."

* On February 3, 2003, Yeoman saw Dr. Bruce Robbins, a Neurologist.   Dr. Robbins noted a three-week history of "spells" uncontrolled by Dilantin 400 mg a day, with a normal CAT scan and EEG.   Yeoman told Dr. Robbins she was having throbbing headaches about three times a week, sleeping only about four hours a night, and having weakness and numbness in her fingers and toes. Yeoman was taking Zoloft, Albuterol, Dilantin, and birth

control pills.  Dr. Robbins planned an MRI of the head
and a trial of Topiramate.

* On February 6, 2003, a cranial MRI was read as
"essentially normal."

* On February 7, 2003, Yeoman was taken by ambulance to
the emergency room following seizure activity, but
apparently did not stay there long enough to receive any
treatment.

* On February 10, 2003, Yeoman was seen in the emergency
room with complaints of a toothache.

* On February 25, 2003, Yeoman completed a Disability
Report Adult, in which she indicated that she could not
work because medicine did not stop her seizures, and
that she first became unable to work on January 11,
2003.  In a Disability Supplemental Interview Outline
that same date, Yeoman indicated no restrictions on her
activities, but stated that she required naps, and that
three or four times a week her muscles would tense up,
and her legs would hurt for thirty minutes, and paralyze
her for a short time.  Standing or walking made the pain
worse, and massaging her legs made it better.  She also
noted that she had depression and asthma. She was taking
Topamax, Dilantin, Zoloft, and birth control pills.  The
Dilantin upset her stomach.  In answer to questions

-6-

about her education, Yeoman indicated that she had completed the 8th grade, and had not been in Special Education classes.

* On March 9, 2003, an ambulance was called for Yeoman, but she was not transported.

* On March 12, 2003, Yeoman was seen in the emergency room with complaints of dental pain.

* On March 23, 2003, Yeoman was seen in the emergency room for a toothache.

* On April 30, 2003, Dr. Robbins saw Yeoman, who reported that she was "doing better on the Topiramate," having "spells" about once a week.  MRI of the head and EEG were normal.  Dr. Robbins decided to gradually increase the dosage of Topiramate to see if it would give better control of the seizures.

* On May 1, 2003, Dr. Jerry Thomas completed a Functional Capacity Assessment for the Commissioner.  Dr. Thomas limited Yeoman to occasionally lifting 20 pounds, and frequently lifting 10 pounds; standing, walking or sitting about 6 hours in an 8-hour workday; and occasionally climbing.  He indicated that she should observe seizure restrictions around hazards such as machinery and heights.  He placed no other limitations on her.

-7-

* Also on May 1, 2003, Dr. Tammy Berke, a Psychologist,
conducted a psychological evaluation of Yeoman for the
Baxter County Department of Children and Family
Services. During that evaluation, Yeoman reported her
seizures, and that her current regimen of Dilantin and
Topamax had slowed them down. She also reported feeling
sad, depressed, weak, tired, guilty, fearful, panicky,
and suicidal. She reported headaches, neck and back
pains, nightmares, and difficulty sleeping. Dr. Berke
found Yeoman's "stream of mental activity" to be
"logical and organized," and considered that she
"displayed no symptoms of psychosis or other major
mental disorders." However, Dr. Berke considered that
Yeoman had significant limitations in her adaptive
functioning, and stated that she was unable to "carry
out her daily activities in a manner consistent with her
intellectual functioning," which appeared to be "at
least low to average." Dr. Berke diagnosed major
depression, anxiety disorder, personality disorder with
borderline personality traits and dependent personality
traits, and seizures. She pointed out that any
improvements in Yeoman's condition would have to take
into consideration her emotional instability, tendency
to withdraw, and mistrust of others, and suggested that

-8-

interventions "focused on symptom relief without confronting major personality problems" were likely to have more success than those which would "confront[] major personality problems."

* On May 5, 2003, Yeoman was treated in the emergency room for a urinary tract infection.

* On May 15, 2003, Nancy Bunting, a Psychologist, prepared a report entitled Mental Status And Evaluation Of Adaptive Functioning, based on an examination of Yeoman. Yeoman reported seizures starting in February, happening once or twice a week, one or two seizures per day, during which her vision blurred, she could not hear, and she became lightheaded.  She was taking Dilantin, Zoloft, Topomax, and birth control pills.  She reported that DHS had taken her children from her on February 13, 2003, and that her mother had died on October 31, 2002. She described her education as going through the eighth grade, with special classes for reading, math, and speech.  Dr. Bunting described Yeoman as "defensive, guarded, and tense," and estimated her IQ as 70-79.  Dr. Bunting diagnosed major depression, and "severe" Axis IV problems, i.e., "problems with primary group, legal problems, school interrupted."  Dr. Bunting rated

Yeoman's GAF at 55.[2]  Dr. Bunting's prognosis was that Zoloft was "clearly not containing [Yeoman's] depression over the loss of her mother and her children." Dr. Bunting opined that Yeoman's functioning was not consistent with a diagnosis of mental retardation.

* On May 22, 2003, an ambulance was called on behalf of Yeoman following seizure activity.  She refused transport and treatment.

* On May 28, 2003, Dr. Robbins noted that Topiramate had decreased Yeoman's "spells" and headaches, but that she had stopped taking it "because of the cost."  She was still taking Dilantin, but reported feeling "medicated" at the dosage prescribed.

* On June 11, 2003, Yeoman was seen in the emergency room with complaint of seizure activity.  Dr. Bufford noted that Yeoman had not taken Dilantin in two weeks, because she could not afford it. Dr. Bufford planned to set up a social services consultation to try to help Yeoman get her medications.

* On June 17, 2003, Dr. Bunting again examined Yeoman, and made a report entitled Intellectual Assessment And Adaptive Functioning.  Yeoman was taking Dilantin,

---

[2]A GAF between 51 and 60 indicates moderate symptoms (such as flat affect or occasional panic attacks) or moderate difficulty in social, occupational or school functioning (such as few friends or conflicts with peers or co-workers). Diagnostic And Statistical Manual Of Mental Disorders, 4th Ed.

-10-

Zoloft, Albuterol, and Topamax. Dr. Bunting administered the Wechsler Adult Intelligence Scale III, and determined that Yeoman had a Full Scale IQ of 79.

* On June 30, 2003, Dr. Brad Williams, a Psychologist, completed a report noting affective disorders (depression) and mental retardation (significantly sub-average general intellectual functioning with deficits in adaptive functioning). These disorders were rated as mildly limiting activities of daily living, and moderately limiting social functioning and concentration, persistence, or pace. In another report that same date, Dr. Williams noted moderate limitations in the ability to understand, remember, and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to set realistic goals or make plans independently of others.

* On July 1, 2003, Larry Jenkins, a Case Consultant, indicated that Yeoman was capable of unskilled light

-11-

work, if restricted from working at unprotected heights and around dangerous machinery, operating an automobile, or carrying a firearm. She needed work "where interpersonal contact is only incidental to work performed. Performed tasks can be no more complex than those learned and performed by rote with few variables and little judgment. Simple, direct and concrete supervision is required." He indicated that jobs such as fast foods worker, counter attendant, and cafeteria worker would fit this description.

* On July 29, 2003, Yeoman was seen in the emergency room with a complaint of "deep depression."

* On August 26, 2003, Yeoman completed a Reconsideration Disability Report, in which she indicated that her condition had changed since she filed her claim, in that her medications helped some, but "not much." She indicated that her doctor had restricted her from working and that she needed "to live with some one." She also noted that she had "deep depression" and asthma. She stated that she could "do things on own," but needed to be watched if she had a seizure. She tried to avoid stressful environments.

* On October 15, 2003, Yeoman was seen in the emergency room complaining of an asthma attack.

-12-

\*    On October 25, 2003, Yeoman was seen in the hospital for seizures.  She told her care givers that she had no money to buy medications.

\*    On October 29, 2003, Yeoman was seen in the hospital with complaints of seizure disorder.

\*    On October 30, 2003, Yeoman was back at the hospital, stating that she was unable to fill her prescriptions. Dr. Charles Smith took steps to put Yeoman in touch with Friends Fund, which appears to be a source of funds for medications.

\*    On November 3, 2003, Yeoman was seen in the emergency room with pain in her hand, diagnosed as superficial thrombophlebitis secondary to an IV that was started in the ambulance when she was taken to the hospital on October 30, 2003.

\*    On November 7, 2003, Yeoman completed another Disability Supplemental Interview Outline.  As in the earlier Outline, she indicated no areas where her functioning was restricted, but said that if she became stressed, she would "go into a seizure," and that she suffered from unusual fatigue, first noticed in February, 2003, and had to take a 2-3 hour nap daily.  Stress and standing caused pain in her legs, lasting an hour or two, which was helped by rubbing them.  She was taking

Dilantin, which made her "sleepy and sick" and Topamax, which made her sleepy. She again noted that she had asthma and "deep depression."

* On December 19, 2003, Yeoman was seen in the emergency room for complaints of shortness of breath. She had a normal chest x-ray, and was treated with Albuterol.

* On December 29, 2003, Yeoman was seen in the emergency room for a toothache. Dr. Charles Smith noted that she had a "3-month history of toothaches. She has not quite made it into the dentist." He found a decayed wisdom tooth.

* On March 11, 2004, Yeoman was seen in the emergency room for a toothache. Exam showed a fractured molar.

* On April 14, 2004, Yeoman was seen in the emergency room for seizure activity. She was advised on that visit to call Social Services for assistance getting her prescriptions filled.

* On April 16, 2004, Yeoman was seen in the emergency room for a toothache. She told Dr. Jennifer Sadler that she was supposed to be taking Dilantin and Topamax, but was not taking them because she could not afford them. She was advised to contact Social Services for help with her prescriptions.

-14-

* On April 20, 2004, Yeoman was seen in the emergency room with a head contusion and cervical strain sustained in some type of altercation.

* On May 4, 2004, Yeoman was seen in the emergency room following a motor vehicle accident.

* On May 13, 2004, Yeoman was treated in the emergency room for dental pain.

* On May 19, 2004, Yeoman was treated in the emergency room for seizure activity.  The chart noted that she was "noncompliant," apparently referring to her seizure medication.

* On June 2, 2004, Dr. Vann Smith conducted a neurophyschological evaluation of Yeoman.  He administered a battery of tests, and reviewed Yeoman's history.  He found Yeoman to have "impaired brain function," consistent with head injury, which would be compatible with Yeoman's history of repeated assaults by her husband.  He also related her depression - at least potentially - to head injuries.  He diagnosed organic brain dysfunction, organic brain syndrome, cognitive dysfunction, organic affective dysfunction, multiple TBI, and seizure disorder. He rated Yeoman's GAF at 65.[3]

---

[3]A GAF between 61 and 70 indicates that a person has some mild symptoms (such as depressed mood or mild insomnia) or some difficulty in social, occupational, or school functioning (such as occasional truancy or theft in the household), but is generally functioning pretty well and has some meaningful interpersonal relationships. Diagnostic

Dr. Smith also filled out a form for Yeoman's attorney, noting that Yeoman had impaired impulse control; mood disturbance; difficulty thinking and concentrating; psychological or behavioral abnormalities associated with brain dysfunction; emotional lability; easy distractibility; and memory impairment. He opined that Yeoman was "unable to meet competitive standards" for maintaining attention for a two-hour segment; punctuality and regularity of attendance; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; understanding, remembering, and carrying out detailed instructions; traveling to unfamiliar places, and using public transportation. He estimated that her impairments would cause her to miss about four days of work each month.

\* On July 7, 2004, Melvin Perryman, Yeoman's father, signed off on a letter describing a seizure he had witnessed, and stating that Yeoman had a leaning

---

And Statistical Manual Of Mental Disorders, 4th Ed.

disability, a split personality, and had been classified as mentally retarded in junior high school.

* Joseph Wells and Becky Short each wrote undated notes describing Yeoman's seizures.

* On July 8, 2004, Yeoman was treated at the emergency room for seizure activity. At the time, she had not been taking Dilantin, and the chart noted that she was "noncompliant."

* On July 14, 2004, Doris Sloniker, Yeoman's grandmother, wrote a note describing her granddaughter's seizures.

* On December 10, 2004, Yeoman completed a Questionnaire for her attorney. She listed, as "health problems which make you unable to work," epileptic seizures, deep depression, and asthma. She said that her seizures began in February, 2003, and that all the jobs she had attempted after this date were affected by multiple absences due to seizures. She stated that she had muscle contractions during seizures which caused excruciating "charlie horse" type pain in her legs. The pain lasted for thirty minutes to an hour, and the seizures were sporadic. She listed her medications as Dilantin (which upset her stomach), Topamax, Zoloft, Advair, and Albuterol. She also indicated that she took six Tylenol tablets a day for headaches. She indicated

-17-

no problems sitting, standing, or walking, until a seizure occurred. She indicated she had no problems lifting and carrying except that she had to be careful not to bend over too fast so as to avoid going into a seizure. She also indicated that exposure to marked changes in temperature or humidity, or to dust, fumes or gasses, caused asthma attacks. She also stated that she needed help around the house because after a seizure she was "dysfunctional" for six to eight hours. The seizures caused her severe headaches.

* On January 25, 2005, Allen Richter signed a letter stating that he had seen Yeoman twice have seizures.

* On January 26, 2005, the ALJ conducted a hearing on Yeoman's claim. Yeoman's attorney stated that he believed if Yeoman could afford her seizure medication, it would control her seizures, but that would leave the "bigger problem" of organic brain dysfunction, cognitive dysfunction, organic affective dysfunction. He noted Dr. Smith's GAF score of 65 and estimation that Yeoman would miss about four days of work a month, and argued that Yeoman would be disabled even if her seizures were controlled by medication.

* At the hearing, Yeoman testified that her husband drank and hit her, knocking her out on many occasions. She

-18-

also had had loss of consciousness in a car wreck as a child.  She had two small children who had been taken out of her home by DHS, and had been adopted out.  She testified that she slept only about three hours out of 24; that she had weight fluctuations; that she was depressed; that in a typical day she sat around, watched television, and listened to music; that she had difficulty concentrating; that she had low energy, and felt tired upon awakening; that she had trouble controlling her emotions; that Dilantin had been reducing her seizures but she stopped taking it sinch she stopped receiving Medicaid; that she had trouble finding the right words to use; that she became anxious around people; and that when she took all her medications - Dilantin, Topamax and Zoloft - she was sick and sleepy.

*    Subsequent to the hearing, the ALJ submitted Interrogatories to a Vocational Expert, and based on the VE's testimony, found that Yeoman could perform unskilled light work.

4.   The Court finds that the ALJ erred in failing to consider the combined effect of Yeoman's impairments and the side effects of her anti-convulsant and anti-depressant medications. Among the recognized side effects of Topamax, the branded form of

topirimate, are confusion; psychomotor slowing; difficulty with concentration, attention, memory, and speech; depression; and somnolence and fatigue.[4]   Dilantin can cause mental confusion, dizziness, nausea, vomiting, insomnia, transient nervousness, and headaches.[5]   Somnolence is one of the more common side effects of Zoloft.[6]   Yeoman complained of these types of symptoms consistently, and specifically indicated that her fatigue began in February, 2003, which is when she began taking anti-convulsants. She indicated at various times that both financial difficulties and sleepiness and nausea caused her to not take her anti-convulsants.

It may be that some of the problems Yeoman exhibited in tests and observations by Dr. Berke, Dr. Bunting, and Dr. Smith were caused by Yeoman's medications, but those problems may have been caused by conditions other than the medications.  If the latter situation obtains, there is the very real possibility that the side effects of Yeoman's medications, when combined with otherwise existing depression, low IQ, emotional lability, and cognitive impairments, would make it impossible for her to work.  Yet without anti-convulsant medications, Yeoman clearly cannot work because of the frequency of her seizures.  There is also the

_____

[4]Physicians' Desk Reference, 2007 Ed.

[5]Physicians' Desk Reference, 1995 Ed.

[6]Physicians' Desk Reference, 2007 Ed.

fatigue/nap problem caused by the medications. In order to evaluate Yeoman's subjective complaints of nausea, fatigue, and insomnia, it is necessary to consider the side effects of her medications. **Polaski v. Heckler**, **739 F.2d 1320 (8th Cir. 1984).**

In addition, the extremely limited nature of Yeoman's daily activities and social contacts suggests that Yeoman may be one of those people with mental disorders who "have their lives structured in such a way as to minimize stress and reduce their signs and symptoms," and who is "much more impaired for work than their signs and symptoms would indicate." **Hutsell v. Massanari**, **259 F.3d 707, 711 (8th Cir. 2001)**(quotation marks and citations omitted).

Neither Dr. Robinson nor Dr. Robbins was asked to assess either Yeoman's seizure disorder or the side effects of her seizure medication on her ability to perform work. Dr. Berke, Dr. Bunting, and Dr. Smith did not treat Yeoman, and based their opinions on tests and examinations from only one visit (Drs. Berke and Smith) or two visits (Dr. Bunting). Thus the record is not sufficiently developed for an informed decision to be made about whether Yeoman's conditions, and the necessary pharmaceutical treatment for those conditions, when considered in combination, would allow her to perform full-time work in a competitive environment.

-21-

The Court, therefore, will remand this case, with instructions for the ALJ to obtain reports from Dr. Robinson and Dr. Robbins about the effect of Yeoman's seizure disorder and the medications she takes for it on her ability to perform work.  In addition, given that Yeoman's problems apparently stem from repeated head injuries, the Court suggests that the ALJ obtain a neuropsychiatric work-up from a source other than Dr. Smith, whose opinion the ALJ discredited.  The sophisticated testing a neuropsychiatrist can perform is capable of identifying performance deficits stemming from head injuries which may not be readily apparent to other specialists. The neuropsychiatrist should also be requested to evaluate the effect of Yeoman's medications on her ability to perform work.

When the foregoing information is obtained, the Commissioner is directed to reconsider the disability determination in light of the combined effect of Yeoman's mental impairments and the side effects of necessary medications on her ability to work.

Accordingly, the Court reverses the decision of the Commissioner, and remands this case to the Commissioner for further consideration pursuant to sentence four of **42 U.S.C. §405(g)**.

If plaintiff wishes to request an award of attorney's fees and costs under the Equal Access to Justice Act, an application may be filed up until thirty days after the judgment becomes "not

appealable," i.e., thirty days after the sixty-day time for appeal has ended.  **Shalala v. Schaefer**, 509 U.S. 292 (1993); 28 U.S.C. §§ **2412(d)(1)(B) and (d)(2)(G).**

      **IT IS SO ORDERED.**

                                      **/s/Jimm Larry Hendren**
                                      **JIMM LARRY HENDREN**
                                      **UNITED STATES DISTRICT JUDGE**